**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Susan Casaceli, | No. CV-21-01413-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Liberty Healthcare Corporation, | |
| Defendant. | |

At issue is the Motion for Summary Judgment (Doc. 52, "MSJ") filed by Defendant Liberty Healthcare Corporation ("LHC"), to which Plaintiff Susan Casaceli filed a Response in opposition (Doc. 58, "Resp.") and LHC filed a Reply in support (Doc. 65). The Court also considers LHC's Statement of Facts (Doc. 54, "DSOF") and Plaintiff's separate (Doc. 59, "PSSOF") and controverting Statements of Facts (Doc. 59, "PCSOF"). Having reviewed the briefing and evidence submitted by the parties, the Court finds oral argument unnecessary to resolve the issues raised therein. *See* LRCiv 7.2(f). For the reasons set forth below, the Court concludes LHC is entitled to summary judgment on each of Plaintiff's claims but is not entitled to summary judgment on its counterclaim for conversion. The Court therefore grants in part and denies in part LHC's Motion.

## I.     BACKGROUND

Plaintiff filed this action in Maricopa County Superior Court in July 2021. (Doc. 1-2, Compl.) Her Complaint alleges retaliation and discrimination by LHC, her employer from November 2019 to August 2020. She raises claims for wrongful termination in

violation of the Arizona Employment Protection Act ("AEPA") and claims for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Arizona Civil Rights Act ("ACRA"). LHC removed the case to this Court in August 2021. LHC thereafter filed counterclaims for misappropriation of trade secrets and conversion. LHC now moves for summary judgment on each of Plaintiff's claims and on Plaintiff's liability for its conversion counterclaim. The Court summarizes the key facts relevant to these claims, both disputed and undisputed.

In July 2019, LHC responded to a Request for Proposals ("RFP") on a consulting project with the Arizona Division of Economic Security/Division of Developmental Disabilities ("DDD"). The project required identifying areas where DDD was not performing up to cost-containment standards and working with DDD to improve. The consultant's relationship with DDD had the potential to be contentious, as DDD personnel were concerned the project might jeopardize their employment. In September 2019, DDD accepted LHC's proposal and the parties entered into the contract contemplated by the RFP. (PSSOF Ex. G (the "DDD Contract").)

In November 2019, LHC hired Plaintiff to serve as a Clinical Quality Director. She excelled in this role. On March 2, 2020, she was promoted to Executive Director for the DDD Contract. In this position, she was responsible for coordinating staff, identifying gaps in DDD's processes, organizing reports about LHC's work and assuring LHC was a "cooperative and collaborative partner," and anticipating and preventing issues in the relationship that could result in "customer dissatisfaction." (DSOF ¶ 6 (quoting Ex. 4).) Vice President of Operations Todd Graybill served as Plaintiff's supervisor until April, when Kate Obert took over this role as Director of Operations. Ms. Obert also supervised the Executive Directors of several other LHC programs.

In its proposal to the DDD, LHC had proposed "more than a dozen internal and external subject matter experts (SMEs)." (PSSOF Ex. F at vii.) The proposal named seven SMEs who were "secured for and committed to this project." (*Id*. at 46.) After Plaintiff was hired, she reported concerns to her supervisors that LHC had not yet followed through on

this commitment. She believed failing to do so could be a "misrepresentation to the government." (PSSOF Ex. A, Deposition of Susan Casaceli ("Casaceli Dep.") at 139:22-142:17; Ex. C, Declaration of Susan Casaceli ("Casaceli Decl."), ¶ 17.) Plaintiff testified that her supervisors told her not to worry about it. (Casaceli Dep. at 140:3–141:5.)

Plaintiff also had concerns about LHC's billing. As Executive Director, she reviewed and submitted invoices to the DDD. She grew concerned about DDD staff reaching out to LHC staff directly with *ad hoc* requests, leading to duplicative work. She was particularly concerned about Jean Tuller, an SME she supervised, responding to work requests without checking whether others were already working on them. On June 12, 2020, she sent an email to DDD staff asking them to field all work requests through her. (PSOF Ex. H.) She also exchanged emails with Ms. Tuller about this "duplication of effort" issue and copied Ms. Obert. (*Id.*; Casaceli Dep. at 150:1–9.)

On June 16, Plaintiff and Ms. Tuller had a tense exchange during a videoconference staff meeting. Plaintiff stated that after she broached the topic of invoices, Ms. Tuller "began raising her voice at me." (Casaceli Decl. ¶ 22.) Plaintiff stated that she messaged either Mr. Graybill or Ms. Obert, who told her to shut off her camera and they would "take it from there." (*Id.*) Ms. Obert recalled the meeting differently. She stated that Ms. Tuller was providing "feedback about the status of the project" when Plaintiff "snapped at her and said, 'I'm the Executive Director' in a very angry manner," and "then walked away and shut off her videocamera, requiring Todd Graybill and me to continue facilitating the meeting." (DSOF Ex. 1, Declaration of Kathryn Obert ("Obert Decl."), ¶ 6.) She believed Plaintiff's reaction "was inappropriate and unprofessional." (*Id.*)

After the meeting, Ms. Tuller requested a different supervisor. Ms. Obert agreed. This was not the first time she had been made aware of reports of issues involving Plaintiff. Ms. Obert testified that she had held meetings with DDD staff who expressed dissatisfaction with Plaintiff's performance and LHC's work. (*Id.* ¶ 4; DSOF Ex. 2, Deposition of Kathryn Obert ("Obert Dep.") at 65:2–67:24.) According to Ms. Obert, DDD staff described Plaintiff as "disorganized" and "emotional," and indicated she was

"misrepresenting" LHC's progress. (Obert Decl. ¶ 4.) She stated that DDD staff "specifically stated that they lacked faith in Ms. Casaceli's ability to lead the project." (*Id*.) She stated that LHC staff had also expressed concerns about Plaintiff's "leadership and performance." (*Id*. ¶ 5.) In May, she and Mr. Graybill met with Plaintiff and provided this feedback to her. Plaintiff pledged to improve.[1] After the meeting on June 16, Ms. Obert and Mr. Graybill decided to place Plaintiff on a performance improvement plan. (*Id*. ¶ 7.)

Nonetheless, Plaintiff emailed Ms. Tuller on June 17 to explain the detail she wanted from her invoices. Plaintiff testified that Ms. Tuller still refused to comply. (Casaceli Dep. at 150:1–9.) The same day, she sent an email to Ms. Obert documenting issues with Ms. Tuller, including the lack of detail in her invoices and the duplication of work. Plaintiff also wrote an email to herself memorializing comments she made to Ms. Obert about Ms. Tuller, including that she requested Ms. Tuller "itemize her billing by date and activity," as she was concerned the invoices she submitted "did not provide sufficient supporting documentation for me to determine their accuracy, as required by [the Contract]." (DSOF Ex. 13.) She wrote that when she raised the issue with her supervisors, however, she was told "the only way we make money is off of salaries." (*Id*.) She testified she also had a conversation with Ms. Gibbs in which she told Ms. Gibbs that she believed Ms. Tuller was "overbilling," "double billing," and "billing for work that she may not have done. (Casaceli Dep. at 175:15–22.) Plaintiff believed this amounted to fraud. (*Id*. at 176:3–8.[2])

On June 18, 2020, Ms. Obert issued the performance improvement plan ("PIP") to Plaintiff. The PIP stated that Plaintiff's behavior was "creating an environment that is not supportive and that your leadership style is non-collaborative, defensive, scattered, [and] not truthful." (DSOF ¶¶ 24–25.) The PIP also stated that DDD "has expressed concerns about the quality of work being completed by the team and your ability to lead the program," noting this feedback had been shared with Plaintiff before. (*Id*.) Plaintiff stated

---

[1] Plaintiff does not dispute this meeting took place, but she disputes that the feedback was accurate. (PCSOF ¶ 13.)

[2] LHC disputes that Plaintiff actually believed this. LHC points to an email exchange in which she suggested, in connection with prior billing invoices challenged by DDD, that the Contract did not require "the breakdowns [DDD was] asking for." (Obert Decl., Ex. E.)

that although she continued to raise issues about LHC's billing practices, she also "tried diligently to comply with [the PIP] to placate my supervisors." (Casaceli Decl. ¶¶ 49–51.) She subsequently received another written warning. She believed this was all part of an effort to justify terminating her in response to her reports about LHC's practices. (*Id*. ¶ 52.)

Plaintiff believed it was also retaliation for reporting that DDD staff had been verbally harassing female LHC staff, including herself, since April 2020. (Casaceli Decl. ¶ 31.) Describing the conduct she felt was harassment, she testified there was a "distinct difference" in the way that DDD's Chief Medical Officer, Dr. Timothy Peterson, spoke to female and male LHC staff. (Casaceli Dep. 63:2–23.) She testified that during meetings, Dr. Peterson and other DDD staff interrupted her, misrepresented her work, and impugned her integrity. (*Id*. at 64:23–66:12.) She stated that two women under her supervision, Debbie Dyjack and Lisa Palucci, told her that Dr. Peterson made them "uncomfortable" during meetings "by acting with hostility" towards them and impugning their integrity, and, in Ms. Dyjack's case, "demeaning her." (Casaceli Decl. ¶¶ 33–34.) Plaintiff stated she observed this treatment on "more than one occasion." (*Id*. ¶ 35.) Before meetings, she noted, both women "would become visibly anxious." (*Id*. ¶ 38.) Afterward, they "seemed upset, anxious, and stressed." (*Id*. ¶ 37.) According to Plaintiff, Ms. Dyjack told her that if the "harassment did not stop, she would have to look for another job." (*Id*. ¶ 38.) Plaintiff stated that both Ms. Dyjack and Ms. Palucci told her they "never experienced" anything like this treatment before. (*Id*.) She relayed their reports to Ms. Obert. (*Id*. ¶¶ 33–34.[3])

Plaintiff believed this conduct was directed at Ms. Dyjack, Ms. Palucci, and herself because they were female. She observed that her "male colleagues and subordinates were not treated with the same vitriol." (*Id*. ¶ 31.) She noted that an IT manager, Blake Jones, and another male employee, George Stevens, did not report issues with DDD staff. (*Id*.; Casaceli Dep. at 130:6–14.) When she gave updates, "Dr. Peterson and/or [Chief Quality

---

[3] Plaintiff testified that another woman, Susan Wortman, told her that Dr. Peterson had "harassed all of her nurses" in a "previous employment situation." (Casaceli Dep. at 63:17–22, 128:7–13.) Specifically, Plaintiff testified that Ms. Wortman told her that when she (Ms. Wortman) worked with Dr. Peterson previously, she "had to tell him more than once to stop beating up my nurses." (*Id*. at 63:17–23.)

Officer Roberta Ellerston] would jump all over me. Blake would present his piece and stumble over himself and talk for two seconds, not a peep." (Casaceli Dep. at 131:10–18.)

Plaintiff said a July 2020 meeting "sticks out" to her. (*Id*. at 65:1–23.) She was in the middle of providing an update on LHC's progress when Dr. Petersen and Ms. Ellerston "interrupted and said that I was misrepresenting the work that Liberty had done." (*Id*.) She described the meeting as "tumultuous" and stated she "blacked a lot of it out." (*Id*.) She felt she was being "mercilessly attacked" and that Dr. Peterson "said a lot of things that were incorrect." (*Id*. at 170:3–21.) She stated she "wrote a detailed e-mail afterwards and [Ms. Gibbs] was on the phone and we spoke in detail afterwards, and I said, "This can't keep happening. It's been going on for months. I need you to do something about this." (*Id*. at 65:12–23.) Eventually, she said, LHC's medical director, Thomas Ball, intervened, but neither Mr. Graybill, nor Ms. Gibbs, nor Ms. Obert "did anything to help me." (*Id*.) Plaintiff testified that she detailed this treatment in emails to and conversation with her supervisors. (*Id*. at 64:10–17, 131:22–132:17.) She also testified that Mr. Graybill, Ms. Gibbs, and Ms. Obert were present at meetings in which this treatment occurred. (*Id*. at 64:15–17.) In response, she said, she was told "not to defend myself so I didn't." (*Id*. at 169:3–10; Casaceli Decl. ¶ 43.) For her part, Ms. Obert stated that Plaintiff "would on occasion complain about DDD staff member's criticism of her and her work," but she denied that Plaintiff ever complained of conduct that Plaintiff "stated she believed was motivated by gender bias, or that was sexually harassing in nature." (Obert Decl. ¶ 15.)

Matters came to a head in late July 2020. On July 22, DDD's Assistant Director, Zane Garcia Ramadan, emailed Ms. Obert a document outlining DDD's complaints about LHC staff. Ms. Obert forwarded the document to Plaintiff and Ms. Gibbs. Plaintiff then sent the document to LHC staff working on the DDD project. Plaintiff testified that she disseminated it at Ms. Gibbs's direction, speculating that Ms. Gibbs told her to disseminate the email "so they could put the final nail in my coffin." (Casaceli Dep. at 102:15–103:4.)

On July 23, Mr. Ramadan emailed Ms. Obert that he had learned that Plaintiff had shared the document, whose contents were "not meant to be dispersed verbatim among the

LHC staff," which he called "extremely problematic on many levels and I think speaks to one of the primary concerns we have about her as the leader of this project in Arizona." (DSOF ¶ 33.) Mr. Ramadan wrote that it would have "long-lasting ramifications" on morale and "will now make it more difficult for our teams to forge a positive and productive partnership moving forward." (*Id*.) Ms. Obert stated that DDD then made clear it no longer wanted Plaintiff to serve as Executive Director of the project. (Obert Decl. ¶ 13.) She decided to remove Plaintiff as Executive Director. (*Id*. ¶ 14.) On July 27, Ms. Obert informed Plaintiff she was being removed as Executive Director and gave her the option to resign or be terminated. (*Id*.) Plaintiff was ultimately terminated on August 15, 2020.

At the time Plaintiff was terminated, she was in possession of an LHC laptop containing internal company documents. (Casaceli Dep. at 118:22–120:24.) She testified that she made arrangements for the return of the laptop with Mr. Jones, but "that didn't happen." (*Id*.) She returned the laptop through counsel in July 2022. (PSOF, Exs. R, S.)

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce

evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden of production, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." (citation omitted)).

## III.   ANALYSIS

LHC moves for summary judgement on each of Plaintiff's claims against it and on Plaintiff's liability for its conversion counterclaim.[4] In response, Plaintiff argues that there are material factual disputes precluding summary judgment on her claims and that LHC's conversion counterclaim "fails." (Resp. at 17.) The Court examines the parties' arguments and evidence pertaining to each claim in turn.

### A.   Wrongful Termination Under the AEPA (Count One)

Plaintiff's first claim is for wrongful termination in violation of A.R.S. § 23-1501(A)(3)(c). This provision of the AEPA "deal[s] with the remedies for an employee

---

[4] LHC's Motion does not address its counterclaim for misappropriation of trade secrets. (*See* Doc. 10 at 15.) Plaintiff did not file a summary judgment motion of her own.

terminated for whistle-blowing." *Walters v. Maricopa County*, 990 P.2d 677, 682 (Ariz. Ct. App. 1999). It provides, in relevant part, that an employer is liable to an employee if it terminated the employee in retaliation for:

> (i) The refusal by the employee to commit an act or omission that would violate the Constitution of Arizona or the statutes of this state[; or]

> (ii) The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state or an employee of a public body or political subdivision of this state or any agency of a public body or political subdivision.

A.R.S. § 23-1501(A)(3)(c).

Although Plaintiff's Complaint alleged violations of subsections (i) and (ii), she maintains only her subsection (ii) claim in responding to LHC's Motion. Thus, to make out a *prima facie* claim, she must show that (1) she engaged in a protected activity, meaning she disclosed to an appropriate supervisor "in a reasonable manner" that she had "information or a reasonable belief" that LHC or one of its employees had or would violate Arizona law; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *See* A.R.S. § 23-1501(A)(3)(c)(ii); *Whitmire v. Wal-Mart Stores, Inc.*, 359 F. Supp. 3d 761, 796 (D. Ariz. 2019).

LHC does not dispute the second element, but argues that Plaintiff did not reasonably disclose a reasonable belief that LHC or one of its employees was breaking Arizona law. LHC also argues there was no causation between the alleged disclosures and her termination. LHC further contends, and Plaintiff does not dispute, that the burden-shifting framework applied to Title VII claims also applies to Plaintiff's AEPA claim. Under this framework, if Plaintiff can establish her *prima facie* case by satisfying the elements above, then the burden shifts to LHC to articulate a legitimate, non-retaliatory

reason for terminating Plaintiff's employment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). If LHC accomplishes this task, then the burden shifts back to Plaintiff to show the proffered reason is pretextual. *Id*. at 804. Consistent with the weight of authority, the Court analyzes Plaintiff's claim under this framework.[5]

### 1.    *Prima Facie* Case of Wrongful Termination

### a.    Protected Activity

LHC does not dispute that Plaintiff raised concerns to her supervisors about its employment of subject-matter experts ("SMEs") and its billing practices relating to the SMEs. LHC also concedes that an aggrieved employee does not need to cite a specific statute when reporting purportedly illegal activity to her supervisor. *See Secord v. Marketo Inc.*, CV-18-03142-PHX-GMS, 2020 WL 1033165, at *2 (D. Ariz. Mar. 3, 2020) (citing *Morris v. Terros*, No. CV-03-2572-PHX-SMM, 2006 WL 2168587, at *9 (D. Ariz. July 28, 2006)). However, she "must actually disclose belief of a violation." *Id*.

Plaintiff asserts that her communications constituted reports of consumer fraud in violation of A.R.S. § 44-1522, in that LHC made material misrepresentations in seeking the DDD Contract and was misrepresenting the nature of its work under the Contract. She cites *Murar v. AutoNation, Inc.*, for the proposition that an employee's disclosure of a purported violation of A.R.S. § 44-1522 need not use the word "fraud" for a court to find the employee has engaged in protected behavior. *See* No. CV-19-05793-PHX-MTL, 2021 WL 3912849 (D. Ariz. Sept. 1, 2021). The Court notes that in *Murar*, however, the plaintiff had used the words "fake" and "fraudulent" to describe a questionable customer repair order in an email to his supervisors, which the court found sufficient to support a finding that the plaintiff had engaged in protected activity. *Id*. at *7.

---

[5] "[N]o published opinion in Arizona has adopted the *McDonnell Douglas* burden-shifting framework for wrongful termination claims under A.R.S. § 23-1501." *Berkman v. Walt Danley Realty*, No. 1 CA-CV 22-0584, 2023 WL 5031711, at *2 (Ariz. Ct. App. Aug. 8, 2023). The Arizona Court of Appeals has consistently done so in unpublished memorandum decisions, however. *Id*.; *Scott v. State*, No. 1 CA-CV 22-0581, 2023 WL 3718542, at *3 (Ariz. Ct. App. May 30, 2023); *Baron v. HonorHealth*, 1 CA-CV 19-0391, 2020 WL 5638539, at *2 (Ariz. Ct. App. Sept. 22, 2020); *Czarny v. Hyatt Residential Mktg. Corp.*, 1 CA-CV 16-0577, 2018 WL 1190051, at *2 (Ariz. Ct. App. Mar. 8, 2018). This Court has done the same. *See, e.g.*, *Whitmire*, 359 F. Supp. 3d at 799–800. While none of these decisions is binding, the Court finds them persuasive. *See* Ariz. Sup. Ct. R. 111(c)(3).

1    Nonetheless, the Court agrees that an employee does not necessarily need to use the
2    words "fraud" or "illegal" to reasonably communicate a violation of the law. While both
3    Plaintiff and LHC cite to several cases where employees used these words or their
4    equivalent, the caselaw suggests this may not be a strict requirement. At one end of the
5    spectrum is a clear-cut disclosure where an employee states to an employer that something
6    is illegal: for example, that the employee believes "every single one of these things is
7    against the law." *Revit v. First Advantage Tax Consulting Servs., LLC*, CV-10-1653-PHX-
8    DGC, 2012 WL 1230841, at *3 (D. Ariz. Apr. 12, 2012); *see also, e.g.*, *Levine v. TERROS,
9    Inc.*, CV-08-1458-PHX-MHM, 2010 WL 864498, at *11 (D. Ariz. Mar. 9, 2010) (deeming
10   an email to supervisors that employer billing practices "may be both unethical and illegal"
11   to be a reasonable disclosure of a violation of Arizona law). At the other end of the
12   spectrum are situations where the employee's reports are too vague: for example, requests
13   for clarification that do not "call out illegality." *Secord*, 2020 WL 1033165, at *3.

14   Somewhere between the two lie disclosures that use words like "fake" to describe
15   things like customer repair orders. *See Murar*, 2021 WL 3912849, at *7. In appropriate
16   contexts, communications like these may reasonably indicate that the employee believes
17   the employer or one of its employees is engaging in an illegal activity like fraud, even
18   without explicitly so stating. Here, the Court finds Plaintiff has provided sufficient
19   evidence for a jury to find that she made such protected disclosures to her supervisors.

20   First, Plaintiff reported her belief that LHC misrepresented its compliance with the
21   Contract in terms of the number of SMEs it would employ. In a declaration submitted with
22   her summary judgment briefing, Plaintiff states she told Mr. Graybill that "failing to [hire
23   additional SMEs] could be a violation of the Contract, a misrepresentation to the
24   government, and a threat to the success of Liberty's performance." (Casaceli Decl. ¶ 17.)
25   On its face, the phrase "misrepresentation to the government" reasonably calls out an
26   element of illegality. Considering the context in which it was delivered, a jury could find
27   this communication was a report of her belief that LHC violated A.R.S. § 44-1522. While
28   LHC argues none of this actually amounted to consumer fraud, "[u]nder the AEPA, it is

not necessary that an actual violation of a statute occur." *Harper v. State*, 388 P.3d 552, 554 (Ariz. Ct. App. 2016). Next, LHC argues Arizona's consumer-fraud statute "doesn't apply to proposals to a government agency." (Reply at 4.) But LHC fails to develop this argument beyond a citation to the text of A.R.S. § 44-1521(6), whose relevance is unclear.

Second, Plaintiff reported her belief that Ms. Tuller submitted invoices for work that was not performed or was duplicative, leading LHC to overbill its client. In her deposition in this case, Plaintiff testified to using phrases like "duplication of effort," "overbilling," "double billing," and "billing for work that she may not have done." (Casaceli Dep. at 147:10–148:9, 175:15–22.[6]) She testified that she told Ms. Gibbs, "I really feel like we need to look into this." (*Id.*) It is arguable whether these communications reasonably called out any illegality, even within the context in which they were delivered. In her subsequent declaration, however, Plaintiff flatly states that she reported to Mr. Obert that Ms. Tuller's allegedly duplicative work was "fraudulent." (Casaceli Decl. ¶ 20.)

LHC asks the Court to disregard Plaintiff's declaration under the sham affidavit rule. "A party cannot create a triable issue of fact, and thus survive summary judgment, merely by contradicting his or her own sworn deposition testimony with a later declaration." *Disc Golf. Ass'n v. Champions Discs, Inc.*, 158 F.3d 1002, 1008 (9th Cir. 1998). "In order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). The rule "should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Id.* (quotation marks and citation omitted).

As LHC notes, Plaintiff did not use the word "fraudulent" at her deposition when describing her communications with Ms. Obert or in the email she wrote to herself

---

[6] Plaintiff's Statement of Facts also cites to Page 156 of her deposition testimony. (PSSOF ¶ 23.) This page does not appear upon the Court's review of the exhibited portions of her deposition, however, preventing it from considering this evidence at summary judgment.

memorializing these communications. As Plaintiff confirmed, that email noted only that Ms. Tuller was not "item[izing] her billing," her invoices "did not provide sufficient supporting documentation," and her weekly reports "did not provide detail to substantiate the invoices." (Reply at 2 (quoting Casaceli Dep. at 172:1–173:8).) While the differences between Plaintiff's deposition testimony and her declaration are stark and may present a credibility question for a jury, the Court finds there is not a sufficiently clear and unambiguous contradiction here to justify disregarding the declaration. Construing Plaintiff's evidence in a light most favorable to her, the Court concludes a reasonable jury could find that Plaintiff disclosed billing practices she believed were fraudulent.[7]

**b.    Causation**

Plaintiff argues that the timing of her termination provides inferential evidence of causation, which LHC disputes. Plaintiff also contends that LHC had a financial incentive to continue its billing practices, which, she argues, provides evidence of a retaliatory motive. Plaintiff notes the DDD Contract was LHC's only project in Arizona and LHC received a percentage of the amount its contractors billed. (PSSOF ¶¶ 5–6.)

The Ninth Circuit has held that "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). Plaintiff states she first reported LHC's misrepresentations in May 2020. (Casaceli Decl. ¶¶ 17–18.) Neither Plaintiff nor LHC provide a specific date, so this first report could have come between 76 and 107 days before Plaintiff was fired on August 15. Ms. Obert apparently made the decision to fire her on July 27, further shortening the time period in question. (DSOF ¶ 37.)

On one hand, the Supreme Court has held that a period as long as "20 months later suggests, by itself, no causality at all." *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273–74, (2001). On the other hand, after surveying four Ninth Circuit employment

---

[7] Plaintiff states she also made reports that allowing Ms. Tuller to work on the project from Oregon amounted to a "fraudulent misrepresent[ation]" based on Section 5.2 of the Contract. (Casaceli Decl. ¶ 18.) If Plaintiff believed this a violation of the Contract—let alone a violation of Arizona law—such a belief was not reasonable. Section 5.2 provides: "All staff must be able to physically support from within Arizona." (PSSOF Ex. G at 6.) That clause does not create a strict residency requirement.

discrimination cases, this Court held in *Whitmire v. Wal-Mart Stores, Inc.* that a gap of 62 days provided sufficient evidence of causation for an AEPA claim. 359 F. Supp. 3d at 799. The Ninth Circuit has also held that "an eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory." *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (citation omitted). The Court finds the time period here was sufficiently short to support an inference of causation. Thus, Plaintiff has established a *prima facie* case of wrongful termination.

### 2.    Legitimate, Non-Retaliatory Reason and Pretext

"If Plaintiff provides sufficient evidence to make out a *prima facie* case of retaliation, then the burden shifts to Defendant to articulate some legitimate, non-retaliatory reason for its actions." *Whitmire*, 359 F. Supp. 3d at 799 (citation omitted). LHC asserts it had a legitimate, non-retaliatory reason for placing Plaintiff on a performance improvement plan and ultimately firing her: DDD's expressed dissatisfaction with Plaintiff's leadership. Plaintiff does not directly dispute this and, based on the evidence detailed above, the Court finds it is legitimate and non-retaliatory.[8] Thus, Plaintiff has the ultimate burden to point to "specific and substantial evidence" showing that this proffered reason is pretextual. *Villiarimo*, 281 F.3d at 1062. The Court finds Plaintiff has not carried her burden.

The timeline in this case is not enough to show pretext standing alone. "In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the *prima facie* case and the showing of pretext." *Dawson v. Entek Intern.*, 630 F.3d 928, 937 (9th Cir. 2011). However, those cases typically involve periods of days, not months. *See Behan v. Lolo's Inc.*, No. CV-17-02095-PHX-JJT, 2019 WL 1382462, at *5 (D. Ariz. Mar. 27, 2019) (collecting cases). The circumstances of Plaintiff's firing here do not warrant departure from the usual rule that "mere temporal

---

[8] Plaintiff objects to Ms. Obert's statements about the feedback she received from DDD and LHC staff as hearsay, but LHC does not offer these statements to prove the truth of the matters asserted therein; it offers them to establish Ms. Obert's state of mind. These statements are admissible to demonstrate that she received DDD's feedback and that her decision to fire Plaintiff was not retaliatorily motivated. *See Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001).

proximity is generally insufficient to show pretext." *Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1038 (C.D. Cal. 2014).

Nor is it enough that LHC may have had an incentive to continue the billing practices Plaintiff challenged. To support this claim, Plaintiff cites to descriptions of LHC's financials and client list in her declaration. (*See* Resp. at 11.[9]) That an employer in LHC's position might have a retaliatory incentive to terminate an employee in Plaintiff's position does not provide specific and substantial evidence that this is what occurred here. Without more, her speculation does not speak to what actually motivated LHC's decisions.

Next, Plaintiff argues that LHC's proffered reason is "unworthy of credence." *Gonzalez v. U.S. Hum. Rights Network*, 617 F. Supp. 3d 1072, 1088 (D. Ariz. 2022). This argument is unavailing. LHC has consistently maintained it terminated Plaintiff's employment because Ms. Obert believed DDD was unsatisfied with her leadership and wanted her off the project. It maintains that Plaintiff's email disseminating DDD's concerns with LHC staff was the last straw in a series of complaints. It is true that Plaintiff testified she sent the email at the behest of Ms. Gibbs. (Casaceli Dep. at 102:15–103:4.) If Plaintiff's testimony is credited—which it must be at this stage—it would render her relatively faultless for sending the email, undermining one of DDD's complaints about her. To show pretext, however, Plaintiff cannot simply challenge the factual basis of DDD's complaints; she must produce evidence suggesting that LHC did not honestly believe DDD was dissatisfied and wanted Plaintiff off the project. *See Villiarimo*, 281 F.3d at 1063. While Plaintiff speculates that Ms. Gibbs set her up "so they could put the final nail in my coffin," (Casaceli Dep. at 102:15–103:4), she has not pointed to any evidence that Ms. Obert knew about the instruction from Ms. Gibbs, let alone that she conspired to plant the seeds of Plaintiff's poor performance in the minds of DDD staff as part of an effort to retaliate against Plaintiff for her reporting. Indeed, the evidence shows DDD expressed concerns about Plaintiff before she sent the email.

---

[9] In her Response, Plaintiff cited to LHC's Statements of Facts. The cited portions are not related to LHC's financials, so the Court assumes that Plaintiff is referencing the same paragraph numbers in her separate Statement of Facts.

Finally, Plaintiff contends that LHC did not claim her performance played a role in her termination until after she filed this lawsuit. She argues this claim is inconsistent with the reason given by LHC's human-resources staff, who told Plaintiff when she was fired that "this does not mean that you did a bad job, this doesn't mean that you didn't do a good job. No one is saying that." (PSSOF, Ex. Q at 9:13–16.) This argument misapprehends LHC's proffered reason. LHC maintains Plaintiff was fired because of DDD's expressed concerns, irrespective of whether those concerns were valid. Indeed, the unabridged quotation from the human-relations staff member cited by Plaintiff continues: "It's just [DDD] saying they don't think you are the person for the job and there's nothing wrong with that. There may not be a person for this job. I mean, who knows?" (PSSOF, Ex. Q at 9:13–19.) This is not inconsistent with the reason now LHC proffers. It could be true both that Plaintiff performed well in her role as Executive Director and DDD still wanted her off the project for perceived deficiencies in her leadership and performance, merited or not.

In sum, the Court finds Plaintiff has not produced specific and substantial evidence showing that LHC's proffered reason for terminating her employment was pretextual. LHC therefore is entitled to summary judgment on Plaintiff's wrongful termination claim.

## B. Sex Discrimination Under Title VII (Count Two) and the ACRA (Count Four)

Plaintiff claims LHC allowed a work environment in which she was harassed based on her sex. "To establish sex discrimination under a hostile work environment theory, a plaintiff must show she was subjected to sex-based harassment that was sufficiently severe or pervasive to alter the conditions of employment, and that her employer is liable for this hostile work environment." *Christian v. Umpqua Bank*, 984 F.3d 801, 809 (9th Cir. 2020).[10] "An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it." *Galdamez v. Potter*, 415 F.3d 1015, 1022 (9th Cir. 2005).

---

[10] "The Arizona Civil Rights Act is generally identical to Title VII, and therefore Title VII case law is persuasive in the interpretation of the Arizona Civil Rights Act." *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004).

"[I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). For the objective element, the Ninth Circuit has adopted the "reasonable victim" standard. *Ellison v. Brady*, 924 F.2d 872, 878–90 (9th Cir. 1991). To determine whether the harassment was sufficiently severe or pervasive, courts "consider all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Christian*, 984 F.3d at 809 (quotation marks and citation omitted). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 532 U.S. 75, 80 (1998)).

Taking Plaintiff's evidence as true and viewing it in the light most favorable to her, Plaintiff experienced and witnessed behavior by DDD staff, including Dr. Peterson, that she felt was verbal harassment and caused two of her female coworkers to enter meetings "visibly anxious" and leave them "visibly upset, anxious, and stressed." (Casaceli Decl. ¶¶ 31, 36, 38, 43.) There was a "distinct difference" in the way Dr. Peterson spoke to female employees and male LHC employees. (Casaceli Dep. 63:2–23.) He and other DDD staff interrupted Plaintiff, misrepresented her work, and impugned her integrity, leading her to feel "mercilessly attacked." (*Id*. at 63:2–66:12, 170:8–21.) Dr. Peterson also made Ms. Dyjack and Ms. Palucci "uncomfortable" during meetings by acting with what they felt was hostility, impugning their integrity, and, according to Ms. Dyjack, "demeaning her." (Casaceli Decl. ¶¶ 33–35.) Ms. Dyjack indicated she would quit if it did not stop. (*Id*. ¶ 37.) Ms. Dyjack and Ms. Palucci felt they had "'never experienced' anything like it before. (*Id*. ¶ 38.[11]) Male employees did not experience the same treatment. (*Id*. ¶ 31.)

---

[11] As noted, Plaintiff also testified that Susan Wortman told her that Dr. Peterson had "harassed all of her nurses" in a "previous employment situation." (Casaceli Dep. at 63:17–22, 128:7–13.) Plaintiff testified that Ms. Wortman told her that when she (Ms. Wortman) worked with Dr. Peterson previously, she "had to tell him more than once to stop beating

- 17 -

George Stevens did not report harassment and Blake Jones was not interrupted during meetings like Plaintiff was. (*Id.* ¶ 32; Casaceli Dep. at 130:6–14, 131:10–18.)

LHC points out that none of this conduct is sexual in nature. Plaintiff counters by pointing to caselaw holding that a pattern of abusive conduct that is "not, on its face, sex- or gender-related," may, in appropriate circumstances, be probative of a sex-based hostile work environment. *See E.E.O.C. v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 844–47 (9th Cir. 2005). The Ninth Circuit has held:

> [T]here is no legal requirement that hostile acts be overtly sex- or gender-specific in content, whether marked by language, by sex or gender stereotypes, or by sexual overtures. While sex- or gender-specific content is one way to establish discriminatory harassment, it is not the only way: 'direct comparative evidence about how the alleged harasser treated members of both sexes is always an available evidentiary route. . . . The ultimate question in either event is whether 'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'

*Id.* at 844 (quoting *Oncale*, 523 U.S. at 80–81). The court held that "evidence of differences in subjective effects (along with, of course, evidence of differences in objective quality and quantity) is relevant to determining whether or not men were treated differently, even where the conduct is not facially sex- or gender-specific." *Id.* It "le[ft] open the possibility that in some cases, the quantitative comparison between male and female employees as classes will reveal differences too slight to survive summary judgment." *Id.* at 847.

In *E.E.O.C. v. National Education Association, Alaska*, this meant that conduct directed almost exclusively at female employees including "shouting, screaming, foul language, invading employees' personal space (including one instance of grabbing a female employee from behind), and threatening physical gestures," was sufficient evidence to create a triable hostile-work-environment claim. *Id.* at 843–47. This evidence may not have been overtly sexual or discriminatory, but the Ninth Circuit deemed it sufficient to

---

up my nurses." (*Id.* at 63:17–23.) The first statement is hearsay and the second likely double hearsay. *See Orr v. Bank of Am. N.T. & S.A.*, 285 F.3d 764, 783 (9th Cir. 2002) ("To defeat summary judgment, [plaintiff] must respond with more than mere hearsay and legal conclusions." (quotation marks and citation omitted)). In any event, reports about a different work environment speak little, if at all, to the work environment at LHC.

raise "at least a debatable question as to the objective differences in treatment of male and female employees, and strongly suggests that differences in subjective effects were very different for men and women." *Id.* at 844–46. Applying that holding in *Pappas v. J.S.B. Holdings, Inc.*, this Court held summary judgment was inappropriate where the plaintiff had produced evidence that she was "repeatedly subjected to discourteous, boorish, mean-spirited treatment," including practical jokes, dirty looks, sarcasm, profanities, sexed-profanities, scatological language, and tampering with her computer, and where her male coworkers did not receive such treatment. 392 F. Supp. 2d 1098, 1098–106 (D. Ariz. 2005).

Plaintiff's evidence is much less extreme than the evidence in *National Education Association, Alaska*, or *Pappas*. Here, there was no "frequent, profane, and often public" shouting that had a "hostile physical accompaniment," as there was in *National Education Association, Alaska*. 422 F.3d at 843–84. The conduct here was apparently confined to certain meetings; there is no claim, as there was in that case, of a "general atmosphere of intimidation in the workplace." *Id.* at 844. Nor were Plaintiff or her female coworkers subjected to the level of "boorish, mean-spirited treatment" aimed at the plaintiff in *Pappas*—which even there the court found not "particularly severe." 392 F. Supp. 2d at 1105. Nor, as in *Pappas*, did Dr. Peterson or any other DDD staff use misogynistic terms in talking to or about Plaintiff or her female coworkers. *See id.* at 1104.

In short, Plaintiff has not shown sufficient evidence of objective qualitative and quantitative differences in the way DDD staff treated LHC's male and female employees to proceed under the facially sex-neutral approach set out in *National Education Association, Alaska*. While a reasonable jury could find that Plaintiff and her female coworkers subjectively felt DDD staff's treatment of them was severely hostile, the record is insufficient to support a finding that a reasonable woman in their position would find it so. *See Faragher*, 524 U.S at 787. To the extent Plaintiff's evidence describes specific behavior by Dr. Peterson, such as interrupting female employees, misrepresenting their work, and impugning their integrity, this behavior is not sufficiently severe to be actionable. Nor has Plaintiff shown an inversely higher level of pervasiveness. *See Ellison*,

924 F.2d at 878 (holding "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct"). Further, to the extent Plaintiff's female coworkers described Dr. Peterson "acting with hostility" towards them and "demeaning" Ms. Dyjack, Plaintiff has not provided evidence for the jury to find that those characterizations were objectively well-founded.

In sum, Plaintiff has not adduced evidence upon which a reasonable jury could find a pattern of harassment sufficiently severe or pervasive to alter the conditions of her employment, let alone that LHC had adequate notice of a hostile work environment. LHC therefore is entitled to summary judgment on Plaintiff's sex-discrimination claims.

**C.     Retaliation Under Title VII (Count Three) and the ACRA (Count Five)**

Plaintiff claims LHC retaliated against her for reporting the treatment described above. The same burden-shifting framework applies to retaliation claims. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). To make out a *prima facie* case, an employee must show that (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Id*. The plaintiff must show her protected activity was a "but-for cause" of the adverse action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).   If the plaintiff establishes a *prima facie* case and the defendant articulates a legitimate, non-retaliatory reason for its actions, the plaintiff bears the ultimate burden of showing the reason was pretextual. *Ray*, 217 F.3d at 1240.

LHC argues that Plaintiff cannot satisfy the first and third elements of her *prima facie* case and, in any event, it had a legitimate, non-retaliatory reason for the actions it took: "the feedback from the client that it had lost faith in Plaintiff's ability to lead the project." (MSJ at 16.) LHC argues Plaintiff cannot meet her burden to show pretext. In response, Plaintiff argues she engaged in protected activity when she reported the DDD staff's treatment of female employees described above. She makes the same causation and pretext arguments she made in defending her AEPA claim, pointing to temporal proximity and arguing that "Liberty did not begin criticizing [her] performance until she began

1   reporting unlawful conduct, Liberty's proffered explanation for her termination has

2   changes [sic], and it had a financial motive to retaliate." (Resp. at 16.)

3       Even assuming Plaintiff could make out a *prima facie* case, the Court finds she

4   cannot prevail on her retaliation claims for the same reason she cannot prevail on her AEPA

5   claim: she has not created a genuine issue of fact as to whether LHC's proffered reason

6   was pretextual. As discussed above, Plaintiff's temporal-proximity and financial-incentive

7   arguments are not enough on their own. Nor has she produced "specific and substantial

8   evidence" demonstrating that LHC's proffered reason for terminating her employment has

9   shifted over time or is unworthy of credence. *See Villiarimo*, 281 F.3d at 1062–63. LHC

10  therefore is entitled to summary judgment on Plaintiff's retaliation claims.

11      **D.   Conversion (Counterclaim Two)**

12      Finally, LHC moves for summary judgment on Plaintiff's liability for conversion as

13  it relates to her failure to return LHC's laptop computer. Conversion is defined under

14  Arizona law as "an intentional exercise of dominion or control over a chattel which so

15  seriously interferes with the right of another to control it that the actor may justly be

16  required to pay the other the full value of the chattel." *Miller v. Hehlen*, 104 P.3d 193, 203

17  (Ariz. Ct. App. 2005) (citation omitted). "If those elements are shown, a court must then

18  consider the seriousness of the interference and whether the offending party must pay full

19  value." *Id*. (citing Restatement (Second) of Torts § 222A(2)).

20      LHC is not entitled to summary judgment on Plaintiff's liability for conversion. The

21  record does not establish as a matter of law that Plaintiff interfered with LHC's right to

22  control the laptop to the extent she should be required to pay for its full value. The laptop

23  was not lost or destroyed; LHC regained its possession during this litigation. LHC's

24  employees were working remotely at the time Plaintiff was fired. There is, at a minimum,

25  a genuine issue of fact as to whether Plaintiff refused to return the laptop, as LHC claims,

26  or whether LHC simply did not try very hard to pick it up. Plaintiff testified she made

27  arrangements to return the laptop that never materialized. (Casaceli Dep. at 119:3–16.)

28

## IV.     CONCLUSION

The Court concludes Plaintiff has failed to produce evidence showing that LHC's proffered reason for terminating her employment—that its client was dissatisfied with her performance and requested she be removed—was a pretext for retaliation against her for reporting issues with LHC's business practices or sex discrimination. Thus, LHC is entitled to summary judgment on Plaintiff's wrongful termination and retaliation claims. The Court further concludes Plaintiff has failed to produce evidence upon which a reasonable jury could find that LHC allowed its client to create an environment in which she and her female coworkers were harassed based on their sex. Thus, LHC is entitled to summary judgment on Plaintiff's sex-discrimination claims. Finally, the Court concludes LHC has not established Plaintiff's liability for conversion as a matter of law, precluding summary judgment on its conversion counterclaim.

**IT IS THEREFORE ORDERED** granting in part and denying in part Defendant Liberty Healthcare Corporation's Motion for Summary Judgment (Doc. 52). Defendant is entitled summary judgment on each of the claims asserted in Plaintiff's Complaint (Doc. 1-2). Defendant is not entitled to summary judgment on Plaintiff's liability for its conversion counterclaim (Doc. 10 at 15–16).

**IT IS FURTHER ORDERED** that this matter will proceed to trial on the remaining claims. The Court will set a pre-trial status conference by separate Order.

Dated this 17th day of August, 2023.

Honorable John J. Tuchi
United States District Judge